UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NATANAEL RIVERA,

        Plaintiff,

  v.                                   Case No. 09-C-1182

CORRECTIONAL OFFICER DRAKE,

        Defendant.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On December 28, 2009, Plaintiff Natanael Rivera filed pro se civil rights action alleging that Correctional Officer (CO) Michael Drake violated his constitutional rights while Rivera was an inmate serving a sentence at the Wisconsin Resource Center, a secure treatment center administered by the Wisconsin Department of Health Services in partnership with the Department of Corrections. Rivera alleged that CO Drake violated the Eighth Amendment's prohibition of cruel and unusual punishment by inserting his thumb between Rivera's buttocks during a routine pat-down search. The case is before the court on remand from the Court of Appeals. On May 29, 2013, a hearing was held on the issue of whether Rivera had exhausted his administrative remedies prior to commencing his federal lawsuit. As the court set about making its findings of fact and conclusions of law after the hearing, it became concerned that the defendant may have waived this defense by pursuing a decision on the merits in both the district court and on appeal. Because the hearing was just completed and the evidence is fresh in mind, the court will proceed to set out its findings of fact and conclusions of law on the exhaustion issue. But even though the court finds that Rivera failed to

exhaust his administrative remedies, it declines to dismiss his claim at this point. Instead, the court will direct the parties to address the waiver issue in further briefing.

## PROCEDURAL HISTORY

The case was originally assigned to Judge J. P. Stadtmueller, who granted summary judgment in favor of CO Drake in an order dated February 22, 2012, on the ground that even if accepted as true, Rivera's evidence did not amount to a constitutional violation. Rivera appealed, and in an unpublished decision issued on December 5, 2012, the Court of Appeals vacated the judgment and remanded the case for trial with a recommendation that counsel be appointed.

On remand, the case was assigned to the undersigned, and upon receipt of the Court of Appeals' mandate, counsel was recruited. At a telephone status conference conducted with counsel on February 15, 2013, the assistant attorney general (AAG) representing CO Drake requested that the matter be set for a *Pavey* hearing to resolve a factual dispute over whether Rivera had exhausted his administrative remedies before commencing his action. *See Pavey v. Conley*, 544 F3d. 739 (7th Cir. 2008) (holding that factual disputes over exhaustion to be decided by court). The minutes of the conference reflect that there was some discussion about the necessity for briefing, but the court set the matter for a *Pavey* hearing on May 29, 2013, leaving the parties to decide whether further briefing or motion practice was in order. (ECF No. 117.)

On April 29, 2013, Rivera filed a pro se motion objecting to a hearing and preliminary discovery on the issue of exhaustion on the ground that the issue had already been ruled upon by Judge Stadtmueller and the Court of Appeals, and was therefore moot. (ECF No. 122.) The court summarily denied Rivera's motion, noting that he was represented by counsel whose duty it was to

2

file appropriate motions on his behalf. Shortly thereafter, counsel for Rivera filed a motion to withdraw on the ground that Rivera no longer wanted counsel's assistance due to a fundamental disagreement over how the case should be prosecuted. (ECF No. 123.)

The court conducted a telephone hearing on counsel's motion to withdraw on May 2, 2013. At that time, the AAG representing CO Drake explained that neither Judge Stadtmueller, nor the Court of Appeals, had ruled on the issue of whether Rivera had exhausted his administrative remedies. The record reflected that the defendant had moved for dismissal of Rivera's claim for failure to exhaust, but Judge Stadtmueller denied his motion because a factual dispute existed over whether Rivera had filed an offender complaint within the time allowed. Judge Stadtmueller thereafter granted the defendant's motion for summary judgment without resolving the factual dispute over whether Rivera had exhausted his state court remedies. Although Rivera had argued on appeal that the district court had mishandled the defendant's motion to dismiss for failure to exhaust, the defendant noted in his response that the court had ruled in Rivera's favor in denying the defendant's motion to dismiss for failure to exhaust and, thus, the issue was moot. (Appeal Docket No. 18 at 21-22.) In its order vacating the judgment, the Court of Appeals did not address the issue at all. Given this procedural history, the defendant argued that no decision had yet been made on the exhaustion hearing and he was entitled to a hearing on the issue.

The court explained to Rivera that it appeared there had been no determination of the issue and so the *Pavey* hearing would proceed. The court also explained that it did not intend to recruit new counsel for him if he discharged the attorneys that had agreed to represent him pro bono. Rivera appeared to accept the explanation of the court and counsel, and withdrew his request that his attorneys withdraw. (ECF No. 124.) However, a week later on May 9, 2013, Rivera filed a

3

motion requesting the court to reconsider his motion to cancel the *Pavey* hearing. (ECF No. 126.) The court denied the motion in an order dated May 10, 2013. (ECF No. 131.) Rivera thereafter filed a notice of appeal from the court's order denying his motion objecting to the hearing. He also filed a motion for sanctions against the AAG representing CO Drake, and his attorneys filed a second motion to withdraw on the ground that a conflict had developed which prevented them from continuing to represent Rivera. Rivera's motion for sanctions was denied, as was his motion for leave to appeal. However, at a telephone hearing on May 23, 2013, his attorney's motion to withdraw was granted with counsel agreeing to remain on the case as stand-by counsel. The *Pavey* hearing proceeded on May 29, 2013.

## FINDINGS AS TO EXHAUSTION OF REMEDIES

The court finds from the evidence presented at the hearing that Rivera failed to exhaust his administrative remedies. The evidence was clear and convincing. Rivera reported to Unit Manager Martha Stacker on December 15, 2008, that CO Drake had touched him inappropriately during a pat down search that day. According to Stacker's email account of the conversation, Rivera stated that CO Drake "ran his hand across his butt and his fingers grazed his butt crack." (Ex 1010 at 5.) Stacker spoke with Captain Gable who explained that he was in the hall when the searches occurred and saw nothing unusual. Captain Gable informed her that routine searches were performed on five inmates who were not walking single file, as the rules apparently required. He stated that the checks were not above the norm, nor did it appear that any particular search took an extended period of time to complete. Stacker noted that Rivera "most recently expressed that he was abused sexually as a child," and stated that "he felt violated and dirty." (*Id.*) She noted that he appeared "clearly upset

4

and had to be verbally de-escalated to calm down." (*Id.*) He requested and was allowed to take a shower.

Pursuant to policies implemented by DOC in accordance with the Prison Rape Elimination Act (PREA), 42 U.S.C. §§ 15601-09, Stacker immediately reported Rivera's accusation to the PREA investigator at WRC, who at the time was Cheryl Adomovich (now Eplett). Ms. Eplett interviewed Rivera the following day. It appears from her notes that Rivera told her that during a transfer between units some time earlier, he had threatened CO Drake because Drake was holding his arm "real tight." (Ex. 1010 at 6.) Rivera said Drake had done pat-down searches before with no problem. This time, however, Rivera said that instead of going down the side, CO Drake went down his butt using one hand on his left cheek. Rivera acknowledged that CO Drake had gloves on and that the pat down was over clothing. Rivera also stated he has problems from his past and that he was having disturbing dreams and problems sleeping. (*Id.*)

Ms. Eplett also interviewed CO Drake who stated he performs pat-down searches thoroughly but according to the standard he was taught in training. He denied targeting anyone, had never been previously accused of anything improper during a pat-down, and knew Rivera's name but could not recall what he looked like without a photo. Ms. Eplett also interviewed Captain Gable who again stated he saw nothing inappropriate. Captain Gable also said he had viewed the video of the incident and saw nothing inappropriate. It was a typical pat-down search. (*Id.* at 7.) The video was apparently not preserved, and Ms. Eplett did not view it herself. In any event, based on her investigation, Ms. Eplett determined that Rivera's allegations were unfounded and closed the case.

It is undisputed that Rivera's verbal report to Martha Stacker did not initiate his administrative remedies. Under the DOC's Inmate Complaint Review System (ICRS), an inmate

5

must file a complaint on the form supplied by the institution within fourteen calendar days of the occurrence giving rise to it. Wis. Adm. Code § DOC 310.09(1)(a) and (6). Theresa Barwell, an institution complaint examiner (ICE) at WRC, explained how the process works. Complaint forms are in kept in open racks on each unit and are passed out to inmate in segregation by the guards. The completed forms are then deposited in a locked metal box on each unit and picked up by one of the two ICEs each day. Only the ICEs have access to the keys for the boxes. After the complaints are collected, the ICEs review them and enter them into the Inmate Complaint Tracking System (ICTS), a computer program that maintains the information in a searchable database. Once entered, the complaint cannot be deleted. The computer then automatically generates a receipt that is sealed and sent to the inmate. Rivera admitted that he knew he was required to file a complaint in order to initiate his administrative remedies. In fact, he testified that Ms. Stacker told him as much when he reported to her what happened. Rivera testified that he did file a written complaint the next day on December 16, 2008.

Based on the evidence presented, the court finds Rivera's testimony incredible. A certified copy of a print-out from the ICTS showing Rivera's complaint history reveals that he filed 102 complaints at WRC between August 12, 2009, and November 22, 2012. (Ex. 1001). It shows no Offender Complaint filed by Rivera within fourteen calendar days of December 15, 2008. ICE Barwell testified that based on her review of the records, the only Offender Complaint by Rivera alleging similar conduct was filed on received on August 12, 2009. (Ex. 1002 at 2.) The complaint reads:

> While residing on the above unit I was continuing to be harassed by WRC Security Staff \_\_\_\_ whereby this particular officer would keep searching me on a regular basis which led to his finger partially entering my butt during a search.

6

(*Id.*) In the space for "date of incident or request," Rivera wrote "Approximately 10/ongoing/08." (*Id.*) Included in the body of the complaint is the notation "(Submitted for exhaustion purposes) even though outside time limits." (*Id.*) The complaint is signed by Rivera and bears a date of August 3, 2009. Both Barwell and Steven Spanbauer, the other ICE at WRC, testified that they were unaware of any complaint ever being lost, and based on the procedures for handling offender complaints, they believed that Rivera could not have filed a timely offender complaint concerning the incident he claims occurred on December 15, 2008.

Notwithstanding this testimony, Rivera argued that it was nevertheless possible that he filed a complaint over the incident on December 16, 2008, and it was misplaced or lost. He noted he had filed a complaint against Spanbauer accusing him of bias and suggests that Spanbauer might have thrown his complaint away. Rivera placed particular emphasis on a copy of the Offender Complaint that he filed on August 12, 2009, on which Ms. Eplett had made the handwritten notation "2nd complaint regarding same complaint in 12/08." (Ex 1010 at 17.) He also pointed to records of the Oshkosh Police Department which also reference a "second complaint." Rivera argued that the notation on his August 2009 Offender Complaint and the references to "second complaint" in the Oshkosh Police Department records corroborate his testimony that he filed an earlier complaint on December 16, 2008.

The notation on his August 2009 Offender Complaint does not have the meaning Rivera claims. Eplett testified Rivera's August 12, 2009 Offender Complaint triggered a second referral to her pursuant to the PREA. When she received a copy of Rivera's Offender Complaint from the ICE shortly after it was filed, she placed that notation on it to indicate that it concerned the same incident she had previously investigated and closed. It was not an indiction that she had seen an

7

earlier offender complaint concerning the incident.

The same is true of the references to a "second complaint" in the records of the Oshkosh Police Department. (Ex 1011 at 11.) Rivera requested the Oshkosh Police Department to investigate his complaint after he was told by WRC in response to his Offender Complaint in August 2009 that they had investigated his accusation and concluded it was unfounded. Captain Kelly Kent of the Oshkosh Police Department requested the WRC reports and spoke by phone with a WRC administrative captain. In recounting the history of the case, Captain Kent noted that Rivera's allegations had been investigated earlier by WRC and this was his second complaint about the same incident. Upon reviewing the WRC records, including Rivera's own account of the incident, Captain Kent concluded that they fully supported the finding of WRC staff that Drake had conducted a routine pat-down search of Rivera, who was fully clothed, and that while wearing gloves, Drake had run his hand across the outside of Rivera's buttocks area. (*Id.*) Based upon his review of the reports, Captain Kent concluded that WRC had done a thorough investigation and reasonably concluded that Rivera's allegation of sexual assault was unfounded. There is nothing in the Oshkosh reports that suggests that Rivera had filed an Offender Complaint at WRC before August of 2009.

Indeed, the Offender Complaint Rivera filed concerning the matter in August 2009, as well as his response to the ICE's rejection of it as untimely, belie his claim that he previously filed an Offender Complaint over the incident. Rivera noted on his August 2009 Offender Complaint that he was filing it submitting it "for exhaustion purposes . . . even though outside time limits." (Ex. 1002 at 2.) He did not say he was filing it because he had not received a response to a previously filed complaint. Moreover, after the ICE rejected his August 2009 Complaint as untimely, Rivera

8

requested review of the rejection not because he had previously filed a timely complaint, but because of "the seriousness of complaint." (Ex. 1002-1 at 1.) Likewise, when Rivera sought further review of the rejection with the Corrections Complaint Examiner (CCE), he did not claim he had filed a timely complaint that the ICE had misplaced or lost. Instead he again claimed that he was seeking review because of the seriousness of the complaint. (*Id.* at 2.) He also claimed that he did not understand the limitations of the complaint and, contrary to his testimony at the hearing, stated he thought that since he had made a verbal complaint to his unit manager, a report and investigation would be done. (*Id.*) He made the same claim that he thought that his verbal complaint would be sufficient to proceed when he wrote the Governor of the State in September of 2009. (Ex. 18 at 5.) From these records it is thus clear that Rivera did not file an Offender Complaint concerning the December 15, 2008 incident until August of 2009.

Finally, Rivera essentially admitted as much during his own testimony at the hearing. He testified that initially he did not intend to start a lawsuit but just wanted to see justice done. He only decided to file a lawsuit after the WRC investigators and the Oshkosh police concluded that his allegations were without merit. It was then that he realized a civil suit was his only alternative. The clear implication is that he did not seek to utilize the prison's administrative remedies until after the PREA investigation failed to produce the result he wanted. Based on his own testimony and all of the foregoing evidence, the court finds that Rivera did not exhaust his administrative remedies before commencing his civil rights lawsuit against CO Drake.

This should mean the end of the case. Under the Prison Litigation Reform Act (PLRA), prisoners are required to exhaust administrative remedies before filing a federal lawsuit:

> No action shall be brought with respect to prison conditions under section 1983 of

9

> this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Having found that Rivera did not exhaust his administrative remedies – indeed, he did not even attempt to invoke them until the time to do so had long since passed – dismissal would in most cases be automatic. Given the procedural history of this case, however, it is not so clear.

## WAIVER OF EXHAUSTION DEFENSE

In *Perez v. Wisconsin Department of Corrections*, the Seventh Circuit held that when the defendant in a case governed by the PLRA asserts failure to exhaust administrative remedies as an affirmative defense, the district court must resolve that issue before addressing the merits of the case. 182 F.3d 532 (7Cir. 1999). In *Perez*, the defendants had moved for dismissal based on the plaintiff's failure to completely exhaust his administrative remedies. The district court did not decide the motion, but granted summary judgment on the merits in favor of the defendants instead. As to the exhaustion issue, the district court noted that even though the plaintiff had not fully exhausted his administrative remedies at the time he filed suit, he had exhausted them in the meantime. Since dismissal for failure to exhaust would be without prejudice and the plaintiff could simply re-file, the district court concluded that dismissal on the merits would better serve the interest in judicial economy and held that given its decision on the merits, the motion to dismiss on exhaustion grounds was moot. *Id.* at 534.

On appeal by the plaintiff, the defendants asked the court not to decide the merits of the case, but to order dismissal for failure to exhaust. The Seventh Circuit agreed that the district court had

10

erred in addressing the merits instead of dismissing for failure to exhaust:

> The judge did not explain how a request to dismiss the complaint—a request that, if granted, would end the litigation without prejudice—could be rendered moot by a decision on the merits. There is a big difference between dismissals with and without prejudice. Application of a law designed to prevent decision on the merits cannot be avoided by making the very decision whose propriety is contested, then declaring the decision-avoidance statute "moot."

*Id.* In reaching its decision, the court looked to the language of the statute. It noted that the PLRA made exhaustion of administrative remedies a precondition to starting a federal lawsuit. The court explained that there was a good reason why the defendant would prefer to have the exhaustion issue decided first even though dismissal on that ground would be without prejudice: the appellate court might view the merits differently than the district court, as occurred in this case. The court also noted that "[e]xamining the merits first and then ordering a case dismissed on exhaustion grounds only if the plaintiff is apt to prevail not only would disregard the statutory approach, which puts administrative ahead of judicial inquiry, but also would border on (if it would not transgress) the rule against issuing advisory opinions." *Id.*

This doesn't mean that if there are multiple grounds for dismissal in addition to failure to exhaust, a district court may not choose from among them. Thus, the court observed that "a court might properly dismiss a suit such as this to the extent it seeks relief against the Wisconsin Department of Corrections by observing that § 1983 does not authorize litigation against states and their agencies." *Id.* at 536 (citing *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989)). "But the court must not proceed to render a substantive decision," the *Perez* court held, "until it has first considered § 1997e(a). The statute gives prisons and their officials a valuable entitlement—the right not to face a decision on the merits—which courts must respect if a defendant chooses to

11

invoke it." *Id.*

The question that arises from *Perez* is at least similar to the one Rivera appears to have been attempting to raise all along – hasn't the exhaustion defense been waived? *Perez*, of course, is different from this case in that there the exhaustion defense clearly applied and the district court elected to resolve the case on the merits instead of deciding the motion to dismiss. Here, by contrast, Judge Stadtmueller denied the defendant's motion to dismiss on exhaustion grounds because there was a disputed issue of fact. *Pavey* itself states that the procedure to be followed at that point is for the district court to conduct a hearing to decide the exhaustion issue and only then, if the court finds that the plaintiff has fully exhausted his administrative remedies, should "the case proceed to pretrial discovery and, if necessary a trial, on the merits." 544 F.3d at 742. That was not done in this case. The exhaustion issue was apparently ignored, and both parties proceeded to resolution on the merits.

It is understandable why the defendant would decide to seek summary judgment on the merits in order to avoid a trial entirely, rather than proceed to a contested hearing over whether the plaintiff properly exhausted his administrative remedies. As this case shows, hearings are expensive. Two assistant attorneys general and three DOC witnesses traveled to Green Bay from Madison and Oshkosh for the half-day hearing, and the pro bono attorneys recruited for Rivera made the two-hour trip from Milwaukee. In addition, several correctional officers transported Rivera for the hearing. But the question remains: In so doing did the defendant waive his exhaustion of remedies defense? *Perez* acknowledges that defendants certainly can waive the defense of exhaustion of remedies:

> Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or

12

> forfeit the benefit of a statute of limitations. When they assert their rights—as the defendants in this case did—then the judge must address the subject immediately. Otherwise the benefit is likely to be lost, as it was here, for administrative and judicial claims went forward simultaneously and at the end of the judicial proceeding the judge disdained § 1997e(a). The statute can function properly only if the judge resolves disputes about its application before turning to any other issue in the suit.

182 F.3d at 536.

Of course, *Perez* addressed the duty of the district court when the defense of exhaustion is raised, not that of the defendant. It does not directly address the issue of what a defendant must do to preserve the defense when the trial court concludes a *Pavey* hearing is required. On the other hand, in contrast to this case, the *Perez* defendants took unequivocal steps to preserve their exhaustion defense by explicitly asking the Court of Appeals not to decide the merits. Here, by contrast, since there was no other basis on which the Court of Appeals could have affirmed the judgment, the defendant argued the merits. Is that enough to waive the exhaustion defense? Perhaps not if the defendant requested a *Pavey* hearing and was denied. Waiver would seem a harsh result if the trial court's scheduling of the case prevented the defendant from obtaining a final ruling on the issue until after motions for summary judgment were decided. The record does not reflect why a *Pavey* hearing was not held prior to discovery and dispositive motions on the merits.

It is clear from the foregoing that further development of the record on the issue of waiver is needed, and the parties should be provided an opportunity to address the issue. Accordingly, the defendant is directed to file with the court on or before June 17, 2013, a brief and supporting affidavit, if appropriate, setting forth its position on the question of whether the defendant has waived his affirmative defense of exhaustion of remedies. Plaintiff and standby counsel are invited to respond on or before July 3, 2013. The court realizes that it would have been more efficient to

13

address this issue before the hearing. Unfortunately, and despite Rivera's efforts, the court did not appreciate the issue until after it began writing its decision. In any event, all can agree that it would be more efficient to resolve the issue now rather than risk a second appeal and remand. Certainly, it is in the interest of both Rivera and CO Drake to move forward to a just resolution of the case that offers some assurance of finality.

**SO ORDERED** this  31st  day of May, 2013.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court